# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

DAVID WILLIAM BROWN

(Name and Address of Defendant)

**FILED**
OCT - 4 2005
Oct 4, 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**05CR0831**
CRIMINAL COMPLAINT

CASE NUMBER: MAGISTRATE JUDGE MASON

DOCKETED
OCT 11 2005

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __September 22, 2004__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did, (Track Statutory Language of Offense)

having devised a scheme and artifice to defraud and for obtaining money and property by means of material false and fraudulent pretenses and representations, transmitted and caused to be transmitted by means of wire communication in interstate commerce, a writing, sign, and signal for the purpose of executing such scheme, namely, transmitting by Internet to a financial institution located in Alpharetta, Georgia an application for commercial credit.

in violation of Title __18__ United States Code, Section(s) __1343__

I further state that I am a(n) __Special Agent__ (Official Title) and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:  X  Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__October 4, 2005__          at   __Chicago, Illinois__
Date                              City and State

__Michael T. Mason, U.S. Magistrate Judge__   _____
Name & Title of Judicial Officer            Signature of Judicial Officer

**UNDER SEAL**

STATE OF ILLINOIS    )
                     )  SS
COUNTY OF COOK       )

Deron F. Ogletree, Special Agent, Federal Bureau of Investigation, being duly sworn under oath, states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately nine years. I am assigned to the financial institution fraud squad, where I investigate criminal violations involving, among other things, identity theft and fraud.

2. I have received training and have participated in all of the normal methods of investigation, including, but not limited to, visual and electronic surveillance, the general questioning of witnesses, the use of informants, and undercover operations.

3. I have participated in the investigation of the below-described offenses, and have written and read reports concerning the progress thereof. In addition, as a result of discussions with, and information provided by, lay persons and other law enforcement personnel, as well as my review of pertinent documents and investigative reports, I am familiar with many aspects of this investigation. The investigation has also involved the use of a confidential informant ("CI"). On the basis of this information, I allege facts contained herein to show that there is probable cause to believe that DAVID BROWN has committed a violation of Title 18, United States Code, Section 1343 (wire fraud).

4. The information contained in this affidavit is provided for the sole purpose of establishing probable cause to support a criminal complaint. Accordingly, this affidavit is in

1

summary form and does not contain all information known to me and law enforcement regarding this investigation.

## I. SUMMARY OF THE SCHEME

5. DAVID BROWN has obtained identifying information about existing businesses in Illinois from various Internet-based websites and data bases and has then used the identifying information to apply for credit through various retailers. DAVID BROWN fraudulently represented himself or has fraudulently represented other individuals to be officers of the businesses in the credit applications. Once approved for credit, DAVID BROWN, individually or through other individuals, purchased merchandise using the fraudulently-obtained credit with no intention of repaying the stores. DAVID BROWN stored or resold the merchandise for his own profit.

## II. FACTS SUPPORTING PROBABLY CAUSE

### A. Information from Confidential Informant 1 ("CI-1")

6. Agents have interviewed CI-1. CI-1 has multiple criminal convictions, including convictions for burglary, stalking, and possession of controlled substances. On or about April 23, 2005, the Chicago Police Department detained CI-1 based on a transaction CI-1 conducted related to DAVID BROWN's above-described scheme. CI-1 has been charged with deceptive practices and those charges are pending in the Circuit Court of Cook County. I am aware that the State's Attorney's Office has been advised that CI-1 has continued to cooperate in the investigation of DAVID BROWN and it is my understanding that, in light of that ongoing cooperation, the Assistant State's Attorney has sought and obtained continuances in CI-1's case.

**UNDER SEAL**

7. CI-1 voluntarily provided information to agents concerning his/her own activities in connection with DAVID BROWN. No promises have been made by the government to CI-1 concerning CI-1's potential exposure to federal charges or in the related state case. CI-1 informed agents that he/she was providing the information in the hopes that the government will consider CI-1's cooperation in deciding what federal charges will be filed against CI-1 and what sentence the federal government may seek for CI-1.

8. CI-1 told federal agents that CI-1 met DAVID BROWN approximately six or seven years ago through CI-1's friend, whom I will refer to herein as Individual A. Individual A is one of DAVID BROWN's brothers. According to CI-1, approximately two years ago, DAVID BROWN produced phony check stubs for CI-1 as proof of employment, so that CI-1 could rent an apartment. CI-1 advised agents that DAVID BROWN did not ask CI-1 to pay for the check stubs.

9. According to CI-1, approximately one year ago, DAVID BROWN hired CI-1 to work for him doing building renovations. CI-1 related that, at that time, DAVID BROWN was the president of the company, and, according to CI-1, a person whom I will refer to herein as Individual B was the vice-president. CI-1 stated that initially DAVID BROWN paid CI-1 $150 to $200 to perform manual labor stripping floors approximately two to three days per week. CI-1 stated that when CI-1 told DAVID BROWN that he/she did not like doing manual labor, DAVID BROWN gave CI-1 another job picking up merchandise from Home Depot.

10. According to CI-1, DAVID BROWN told CI-1 that CI-1's name had been placed on various Home Depot business accounts so that CI-1 could pick up materials for DAVID BROWN. CI-1 stated that he/she picked up merchandise for DAVID BROWN many times.

3

**UNDER SEAL**

11. CI-1 told federal agents that, as for DAVID BROWN's associates, DAVID BROWN had used the names of Individuals B, C and D as persons associated with the businesses in whose name DAVID BROWN applied for credit. I believe the names of Individuals C and D may be aliases for DAVID BROWN. According to CI-1, DAVID BROWN at times also lists these persons as authorized users on the credit accounts. CI-1 stated that he/she has known DAVID BROWN to apply for credit at Home Depot, Lowe's, Apple Computer, and Dell Computer. CI-1 stated that DAVID BROWN also used his computer to make business cards for his associates in the names of the businesses under which he applied for credit.

12. CI-1 related that on more than one occasion DAVID BROWN met with one or more of his associates at DAVID BROWN's former address, 6516 South Ross, Chicago, Illinois, and his current address, 2118 East 68th Street, Chicago, Illinois where he provided them with an Employer Identification Number ("EIN") form and DAVID-BROWN-made business cards. According to CI-1, DAVID BROWN then instructed his associates as to where to make purchases and what items to purchase. CI-1 stated that DAVID BROWN went with the associates to the retailers but stayed in a truck while one or more of the associates went into the retailer to apply for credit and/or to purchase merchandise on credit. CI-1 also stated that DAVID BROWN provided his associates who entered the retailer with a mobile telephone in order that they or the store manager could communicate with DAVID BROWN, in DAVID BROWN's guise as the business's president, in the case of problems with or questions from the retailer.

13. CI-1 related that, at the time the retailer had the merchandise ready to be picked up, DAVID BROWN provided five or six people to help load the items into a truck and provided other

people to help unload the truck once the truck reached its destination. CI-1 stated that DAVID BROWN used two large white trucks to transport the merchandise and that these trucks, when not in use, are parked in a vacant lot at 59th and Wood Streets in Chicago, Illinois. CI-1 informed agents that he/she has not observed license plates on the trucks.

14. On or about September 30, 2005, I went to the location described by CI-1 (the lot at 59th and Wood Streets) and I observed parked there two large white trucks. Neither truck bore license plates. One truck ("Truck One") had a "Ford" insignia on its front grill and two white stickers in the lower corner of the windshield on the driver's side of the cab. One sticker on Truck One bore the number 1061573 and the other sticker on Truck One bore the number 993033387. Both stickers on Truck One bore bar codes. The other truck ("Truck Two") had yellow/orange and black striping along the front bumper. A white sticker affixed to the driver's side windshield of the cab of Truck Two bore the number 1060853 and a bar code.

15. CI-1 stated that, in order to continue using the fraudulent credit accounts, DAVID BROWN made "phantom payments" on the accounts by using checks DAVID BROWN made on his computer. According to CI-1, DAVID BROWN used real routing numbers but fictitious bank account numbers on the checks. CI-1 stated that DAVID BROWN used Individuals A and B, as well as persons to whom I will refer herein as Individuals F and G to go into the various retailers to make the "phantom payments" on the credit accounts using the fraudulent checks.

16. CI-1 stated that, at some point between in or around January 2005 and on or about April 28, 2005, he/she has observed DAVID BROWN store merchandise obtained in the above-described manner in the garden apartment located at 2118 E. 68th Street, Chicago, Illinois.

17. CI-1 described that, in March 2005, DAVID BROWN provided CI-1 with business cards reflecting CI-1's association with a business named "DCA Construction." CI-1 stated that DAVID BROWN also gave CI-1 a document showing an Employer Identification Number ("EIN") for DCA Construction. According to CI-1, DAVID BROWN instructed CI-1 to go to the Home Depot on Elston Avenue in Chicago, Illinois and to present CI-1's business card, photo identification and the EIN to Home Depot personnel. CI-1 stated that DAVID BROWN told CI-1 to order six skids of Rubber Row Roofing the cost of which would max out the credit limit. CI-1 stated that, while inside the store, CI-1 spoke with DAVID BROWN on a mobile telephone and received instructions on what to purchase. CI-1 stated that he/she made the purchase as DAVID BROWN directed. The total value of the merchandise was approximately $5,996.40. CI-1 was detained when CI-1 attempted to pick up the merchandise as described above in Paragraph 6.

18. On or about August 9, 2005, after CI-1 began to cooperate with federal agents and as a part of this cooperation, CI-1 recorded a conversation with DAVID BROWN in which, among other things, DAVID BROWN spoke about picking up materials from Home Depot.

19. On or about August 18, 2005, CI-1 recorded a conversation with DAVID BROWN in which, among other things, DAVID BROWN spoke about an individual ("Individual J") whom CI-1 believed was also involved in DAVID BROWN's scheme.

20. On or about August 22, 2005, after agents placed on CI-1 audio and video recording equipment, CI-1 went to 2118 East 68th Street, 3d Floor, Chicago, Illinois, and met with DAVID BROWN. Individual A, along with other persons, were also present in the apartment when CI-1 arrived. DAVID BROWN, while seated at his computer and in CI-1's presence, explained to CI-1

**UNDER SEAL**

his technique in obtaining identifying information about existing businesses to CI-1 and how to obtain credit from retailers using that information. DAVID BROWN explained that, as part of the process of applying for credit, DAVID BROWN sometimes used names of his (DAVID BROWN's) associates and, on other occasions, used the actual name of legitimate business's president. DAVID BROWN also showed CI-1 checks he had made on the computer to use purportedly to pay retailers in order to extend the time in the fraudulent credit remained available.

### B. Non-CI Based Investigation

21. I have visited the websites that CI-1 described and that DAVID BROWN showed CI-1 during the August 22, 2005 visit at DAVID BROWN's apartment. One of the websites does permit users to access corporations' status, president, address, and corporate charter number, among other information.

22. Home Depot fraud investigators have provided documents and video surveillance concerning purchases by DAVID BROWN, Individual B, Individual F, and Individual G between 2003 and 2005. Home Depot identified at least seven fraudulent accounts connected with DAVID BROWN:

(a) Account 6035322532871732: Opened in person on or about November 12, 2003 in the name "TDE Construction Co.," with authorized users DAVID BROWN and Individual B. Approximately $55,000 in purchases over a two-week time period.

(b) Account 6035322541456715: Opened over the Internet on or about September 23, 2004 in the name "CD Group," with authorized users DAVID BROWN, Individual F, and Individual G. Approximately $64,000 in purchases over a two-week time period.

(c) Account 6035322543300903: Opened in person on or about September 29, 2004 in the name "CD Group Contractors," with authorized users DAVID BROWN and Individual F. Approximately $2,500 in a single purchase.

**UNDER SEAL**

(d) <u>Account 6035322541463265</u>: Opened over the Internet on or about November 12, 2004 in the name "CAD Contract Glazing Inc.," with authorized users DAVID BROWN, Individual B, and another individual. Approximately $9,400 in purchases over a two-day time period.

(e) <u>Account 6035322541465047</u>: Opened over the Internet on or about November 24, 2004 in the name "DC Industries Inc.," with authorized users DAVID BROWN, CI-1, and Individual B. Approximately $4,000 in purchases over a one-week time period.

(f) <u>Account 6035322541474767</u>: Opened over the Internet in or about February 2005 in the name "D&D Contractors/CD Group," with authorized users DAVID BROWN and two other individuals. Approximately $2,800 in purchases in one day.

(g) <u>Account 6035322541480970</u>: Opened over the Internet in or about March 2005 in the name "DCA Construction," with authorized users CI-1 and another individual. Approximately $6,000 in purchases in one day.

23. Home Depot also identified accounts that were legitimate customer accounts to which DAVID BROWN fraudulently added his name and from which DAVID BROWN made unauthorized purchases.

24. Fraud investigators from Lowe's provided documents concerning purchases by DAVID BROWN between 2004 and 2005. Lowe's identified multiple fraudulent accounts connected with DAVID BROWN, including the following:

(a) <u>Account C821 3114 0210563</u>: Opened over the Internet in or about September 2004 in the name "CD Group," with DAVID BROWN listed as the contact. Approximately $25,000 in purchases in two-week period.

(b) <u>Account C819 2344 0149344</u>: In or about November 2004, DAVID BROWN changed information on existing, legitimate account to his own identifying information, and began making purchases. Over $145,000 in fraudulent purchases over six-week period.

**UNDER SEAL**

## C. David Brown's Fraudulent Use of Company A's Name and Credit

25.     Agents interviewed Victim A, who, along with his/her spouse, owns and operates a flooring business ("Company A"). In or about April 2005, Victim A discovered that DAVID BROWN had been opening and using accounts in the name of Company A, as follows:

   (a)     <u>Staples</u>: On or about April 18, 2004, Company A received a telephone call confirming two orders of office supplies, and also confirming Company A's recent credit application. Company A had not ordered office supplies or applied for credit. Victim A asked Staples to send copies of the invoices. The invoices showed that DAVID BROWN, on behalf of Company A at 2118 E. 68th Street, Suite 3, Chicago, IL 60649-1114, ordered over $3,000 worth of office supplies and had them shipped to the 68th Street address. Victim A told Staples that the orders were unauthorized, and DAVID BROWN was not affiliated with Company A.

   (b)     <u>Bell Computer</u>: On or about April 20, 2005, Company A received a telephone call confirming four separate orders of computers and computer equipment. Company A had not ordered any computers. Victim A's spouse looked at the orders on the Dell website, and saw that they were scheduled to be shipped to an unfamiliar address. Victim A called Dell and instructed Dell that Company A had not ordered the computers or equipment.

   (c)     <u>Office Depot</u>: On or about April 22, 2005, Company A received two credit cards in the mail from Office Depot. Upon inquiring with Office Depot, Victim A discovered that DAVID BROWN had opened the accounts in Company A's name, and had ordered approximately $3,000 worth of supplies. Office Depot supplied Company A with the receipt for the supplies, showing that DAVID BROWN signed for the orders on or about April 9, 2005 and April 11, 2005 in Office Depot's Skokie, Illinois store.

   (d)     <u>Dun & Bradstreet</u>: On or about April 22, 2005, Company A received in the mail a bill from Dun & Bradstreet, stating that Company A ordered a product that would allow it to monitor its credit over the Internet. Company A had not authorized the purchase of this product. Victim A ordered a credit report for Company A from Dun & Bradstreet. The report incorrectly identified DAVID BROWN as a Vice President and Officer of Company A. The report incorrectly identified Company A's telephone number as 773-822-6414, and its address as 2118 E. 68th Street, Suite 3, Chicago, IL 60649-1114.

(e)     SBC: On or about April 22, 2005, SBC informed Victim A that a person saying he/she was Victim A requested that Company A's business line be forwarded to telephone number 773-667-9384. Victim A requested that SBC cancel the call forwarding, because Victim A had not authorized it. On or about April 26, 2005, Victim A discovered that Company A's business line had again been forwarded to telephone number 773-667-9384. Victim A contacted SBC, requested that SBC again cancel the call forwarding, and placed a password on the account to prevent further tampering.

(f)     Verizon Wireless: On or about April 22, 2005, Victim A's spouse opened a mailing from Verizon Wireless and discovered that Verizon was thanking Company A for starting new service. Company A had not initiated any service with Verizon. Documents from Verizon show that the new account, which included five different telephone numbers, was opened by DAVID BROWN on or about April 15, 2005. According to Verizon representatives, BROWN presented a Company A Dun & Bradstreet report and EIN form when opening the new account.

Verizon representatives provided agents with video footage dated April 15, 2005, showing a person I recognize as DAVID BROWN in the Verizon Wireless store, located at 1107 S. State Street, Chicago, IL.

(g)     T-Mobile: On or about April 25, 2005, T-Mobile called Company A's business line multiple times. Given what was happening with the other vendors, Victim A called T-Mobile back and explained that Company A had not ordered new service, and someone was opening up accounts in Company A's name. T-Mobile informed Victim A that DAVID BROWN opened a new account with approximately 13 T-Mobile telephone numbers, in Company A's name. Victim A told T-Mobile that Company A had not authorized the new account. On or about May 3, 2005, Company A was again notified that an additional ten T-Mobile telephone numbers were opened by DAVID BROWN under Company A's name. Victim A informed T-Mobile that Company A had not authorized these telephone numbers.

(h)     Home Depot: On or about April 30, 2005, Company A received three Home Depot credit cards. The cards were in the names of Victim A and two other individuals who did not work for Company A. Victim A went to Home Depot to explain that he/she had not authorized the opening of the accounts.

**UNDER SEAL**

### D. David Brown's Statements About Scheme

#### 1. March 2004 Arrest

24. On or about March 9, 2004, the Lombard Police Department arrested DAVID BROWN at Berland's House of Tools in Lombard, Illinois. DAVID BROWN had previously purchased merchandise from Berland's House of Tools with a check for $4,167.54 that was later determined to be counterfeit. The store contacted authorities when BROWN returned. BROWN attempted to pay for merchandise with a $10,330.20 counterfeit Seaway Bank cashier's check. The police found in DAVID BROWN's possession at the time of his arrest a Home Depot credit card bearing DAVID BROWN's name, the business name "TDE Construction, Inc.," and account number 60353225328717320001 (the same account referenced above in Paragraph 22(a)).

25. DAVID BROWN waived his rights and agreed to be interviewed by the police. BROWN admitted that he created the $4,167.54 and $10,330.20 checks using the computer at his residence, then located at 2040 W. Maypole, Chicago, Illinois. DAVID BROWN gave the Lombard Police Department consent to remove the computer from his residence. BROWN also gave the police consent to search his 1988 Jaguar automobile. The police found in the Jaguar Home Depot receipts and invoices.

26. DAVID BROWN told police that the items he had purchased at Berland's House of Tools with the $4,167.54 check were located in the basement of 6850 S. Merrill, Chicago, Illinois, a 24-unit apartment building owned by Individual H. Individual H allowed police to enter the apartment building and police recovered new tools from building's basement. I believe the

**UNDER SEAL**

apartment building is actually located at 6750 S. Merrill, Chicago, Illinois as there is no building located at 6850 S. Merrill.

**UNDER SEAL**

### 2. November 2004 Arrest

27. The Lincolnwood, Illinois Police Department arrested DAVID BROWN again on or about November 5, 2004. The police found in DAVID BROWN's possession multiple receipts from Lowe's, one Lowe's credit card (account number 82131140210563 (the same account referenced above in paragraph 24(a)), and two Home Depot credit cards (account numbers 6035322541456715000001 and 6035322543300903000005 (the same accounts referenced above in paragraph 22(b) and 22(c))). The Lowe's credit card and one of the Home Depot credit cards bore the business name, "CD Group." The other Home Depot credit card bore the business name, "CD Group Contractors Inc." All three cards had DAVID BROWN's signature on the back.

### 3. February 2005 Arrest

28. The Chicago Police Department arrested DAVID BROWN on or about February 8, 2005 in connection with alleged fraudulent activity at a Chicago-area Home Depot store. DAVID BROWN waived his right to remain silent and agreed to be questioned by federal agents.

29. DAVID BROWN told agents, among other things, that, in May 2001, he incorporated "TDE Construction" and set up a Home Depot business credit account in that name. DAVID BROWN stated that he was the primary user on the account and that Individual B was listed as an authorized user. DAVID BROWN stated that TDE Construction went bankrupt in 2003. DAVID BROWN stated that, in 2002, he incorporated another company called "Landmark Construction" and likewise opened a Home Depot business credit account in that name. DAVID BROWN stated that Landmark Construction dissolved in 2004.

30. DAVID BROWN stated that, in 2003, an individual ("Individual I") told DAVID BROWN that the individual could get DAVID BROWN Home Depot charge cards by adding BROWN to existing Home Depot charge accounts as an authorized user. DAVID BROWN stated that he entered into an arrangement with another individual ("Individual J") by which Individual J provided Home Depot charge cards and DAVID BROWN made purchases for himself and for Individual J.

31. DAVID BROWN described to agents how he (DAVID BROWN) thereafter set up fraudulent Home Depot and other retail credit accounts in various individual and corporate names. DAVID BROWN stated that he listed CI-1 and Individuals B, F, and G as some of the authorized users on the fraudulent accounts.

32. DAVID BROWN estimated to agents that he had committed between $300,000 to $400,000 worth of fraud at Home Depot. DAVID BROWN stated that he and Individual J were also defrauding Lowe's through credit account takeovers and fraudulent account payments.

33. Agents have not yet determined whether Individual J, identified by DAVID BROWN by only his/her first name, is a real person.

34. On or about September 22, 2004, DAVID BROWN applied through the Internet for a commercial credit card through Lowe's in the name "CD Group Contractors Inc." DAVID BROWN was listed as the "billing contact" on the online form. I have been advised by a representative of Lowe's that all Internet-based applications for credit are processed through a financial institution in Alpharetta, Georgia. Lowe's, through the financial institution, approved the form and assigned number 31140210563. DAVID BROWN had this credit card in his possession

**UNDER SEAL**

at the time November 4, 2004 arrest by Lincolnwood Police Department as described above in Paragraph 27.

FURTHER AFFIANT SAYETH NOT.

_____
DERON F. OGLETREE
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
This 4th day of October 2005

_____
Michael T. Mason
United States Magistrate Judge

15